We have three cases on our docket this morning. We may not take a break, but we may. Plan accordingly. First case on our docket is 25-5026 U.S. v. McCarthy. Mr. Duncombe. Good morning, your honors. May it please the court. I'm going to endeavor this morning to reserve about two minutes of time for rebuttal, although I understand it's on me to actually follow through on that. Let's see how close I actually get. This is a case where the court should reverse the judgment of the district court because under any canon of construction, the precursor statutes apply to the McCarthy's conduct and because the precursor statutes are not vague as applied to that conduct. The McCarthy's knew that their customers were using their product to make and prepare drugs, even though some other people might have used those same products to make and prepare poppy seed muffins. This is a statute, the precursor provisions with two lists that serve two distinct purposes. But even if the second list, the more general list, is limited or informed by the first list, the McCarthy's conduct still fits comfortably within the second list. The McCarthy's have ultimately proposed no coherent dividing line that excludes poppy seeds from the provisions of the Precursor Act. But wherever the line is between conduct that could not violate the precursor statutes and conduct that could violate the precursor statutes, McCarthy's conduct is comfortably on the illegal side of things. The statute's a bit of a trap, isn't it? I mean, it expressly excludes unprocessed poppy seeds. We disagree, obviously. Then there's like this secret trapdoor that, if you don't keep reading, drops according to your interpretation. We don't think it's secret at all. And the first thing that I'll point out is the McCarthy's argument is essentially the same argument that failed in Kassir, which is that because the statute named cathinone but didn't name cat, that somehow lulled defendants into a false sense of security. That, well, I don't know anything about cathinone and all I have is cat, so it must be legal. However, Kassir is distinguishable because cat and cathinone would have been in the same section of the Controlled Substances Act, where it defines controlled substances. And so Judge Halshue's argument, if you find that persuasive, which the other two judges on the Sixth Circuit didn't, was that that list in the same section of the statute was narrow and precise, and now the court was trying to expand it by including cat. Here, the statute at issue is the precursor provisions. And that statute is broad and expansive. And the McCarthy's are trying to say, well, if you close one eye and squint, and you look at one portion of a different part of the Controlled Substances Act, that excludes poppy seeds. And we know that excluding something from one or two definitions in Section 802 doesn't mean what the McCarthy's say it means. It doesn't mean that that thing is excluded from the CSA altogether, or that it's excluded from regulation altogether. One of the reasons we know that is because of other sections of 802. 802.17a, for example, defines opium. And it says, as the district court said in her order, she laid this out. It says, but opium does not include the isoquinoline alkaloids of opium. One of the reasons we know that that doesn't mean that the isoquinoline alkaloids of opium are excluded from regulation altogether is that the isoquinoline alkaloids of opium include morphine, codeine, and thebane. So sometimes, excluding something from one definition in 802 just means we're not dealing with that here. The other thing that's notable about the precursor provisions, and Judge Eyde, you looked like you wanted to say something. I so want to say something. I really wish you would just start with your affirmative statutory interpretation. If you could help me understand how you would read this statute from the beginning. Absolutely. So the CSA is broad. It proscribes and prescribes regulations to multiple types of conduct. So there's conduct involving controlled substances themselves. There's conduct involving paraphernalia. And there's conduct involving precursors. And so in the precursor statutes, there are two lists. One list, which is general items, equipment, material, products, chemicals that may be used to manufacture a controlled substance. And another of which is specific. Three-neck round-bottom flasks, tabulating machines, gelatin capsules. That list, that's the second list that I read but appears first in the statutes, is specific items whose connection to manufacturing controlled substance is obvious. So you don't need the qualifier which may be used to produce a controlled substance because a gelatin capsule has obvious relevance to the packaging part of manufacturing. And by the way, gelatin capsules inclusion in the list is one indication that manufacture is not just limited to taking one chemical and a second chemical and producing a third chemical, which is chemical synthesis. That's one of the definitions of manufacture, but it's clearly not the only one that Congress had in mind. So when you've got... The statute defines manufacture. Absolutely. And so that makes this case distinguishable from cases like the Abu El Hawa, which I'm certain I'm pronouncing wrong, but the case that talked about the word facilitate in 843B, where that statute, that term was not otherwise defined in the Controlled Substances Act. So the court was trying to divine the ordinary meaning of that term and then saying, well, we don't necessarily need to go to common parlance because we need to look at that term in the context of the statute. We don't need to engage in that sort of analysis here because Congress has done the work for us. And Congress has said, essentially, we don't want to speculate about all the different ways that people could use various substances, chemicals, products to manufacture, prepare, propagate, cultivate controlled substances. So we're going to make it general and we're going to make the mens rea specific, which is to say more specific than the mens rea that was involved in casere, which was just knowing that cat is a controlled substance. You've got to know not only that the chemical you're dealing with can be used in a manufacturing process to manufacture a controlled substance. No, you need more than that, will be used, don't you? Will be used. Well, so you need may be used because that's the first part of the definition right after chemicals, materials, products, or equipment, which may be used to produce a controlled substance. And you need that your customers or that it will be used. It's passive voice, but that in this case, the customers will be using that product to make a controlled substance. And so that's the balance that Congress has struck in this provision. And it's notable that there's a neighboring provision that has a similar, fills a similar role in the Controlled Substances Act, which is 863, which is the drug paraphernalia statute, which is much more specific in terms of the things it lists, in terms of the factors that courts should consider as to whether something is paraphernalia or not. And so it's narrower. And it also shows that Congress knew how to exclude specific things from provisions like the precursor provision when it wanted to, because Section 863 specifically excludes pipes and other smoking devices that are primarily intended for use in smoking tobacco products. So the structure of 843A6 and 843A7 shows that when you've got a chemical product, material, or equipment that is something that you can show may be used to produce a controlled substance or manufacture under the definitions in the Controlled Substances Act, and that this particular defendant knew that that's what it would be used for, very specific mens rea, that is chargeable as a controlled substance precursor offense. And if I may move on to due process. Is this the first prosecution of poppy seeds as a precursor? Absolutely not. And we cited some of the examples in the hearing. And so towards the beginning of the hearing transcript with the district court, there was a case out of, it was out of Iowa, I believe, but it was a couple from Flagstaff who had Carolyn's Dried Flowers was the business. But in reality, the business was a sham just to get poppy seeds in the hands of people who were going to make poppy seed tea. There's also- These are cases involving just prosecutions. They're not reported opinions, or are they? No, no. And I want to be clear. This is, I wish we had a reported opinion on poppy seed tea. We don't, but we have the Carolyn's Dried Flower case out of Flagstaff. And again, that's, we discussed that case at the beginning of the hearing with the district court on the motion to dismiss. There's also the Tew case, which is, again, not a published opinion, but it's from a district court in this circuit that said, if you're sending out these specialized water bottles to help people make poppy seed tea by extracting the opium latex from the surface of the poppy seeds, that's manufacturing under the Controlled Substances Act. And so that's possession of precursors. So the question for both statutory interpretation, but in particular due process in this case, because I think the district court was very concerned about the potential lulling into a false sense of security, as Judge Tinkovich alluded to at the beginning here. The judge was thinking about this in terms of, would a person just shopping at a grocery store have any inkling that there is some conduct involving poppy seeds that could be illegal? And even if the answer to that question is no, it doesn't preclude this prosecution, because that's not the question under a due process vagueness analysis. The question is, would these defendants be on fair notice that their conduct and the knowledge that they have is prescribed under the Controlled Substances Act? And so they didn't have to specifically know that their conduct was illegal, because ignorance of the law is still no defense. The question is not, did they know specifically that their conduct was illegal? The question is, does the statute provide fair notice? And here it does. In general, statutes preclude conduct, not objects. So the question may well be asked, could a hammer be a dangerous weapon or a deadly weapon? And the answer is, it depends on how it's used. And so the question could come up, could a poppy seed be a drug precursor? And the answer is, depending on how it's used. And based on the very specific knowledge that was alleged in this case, there's no question that the statute can be applied this way and that the statute can constitutionally be applied this way. And if I may, if there are no further questions at this point, I'd like to reserve the remainder of my time. Sure. Ms. Yaffe? Good morning, Your Honors. I'm Leah Yaffe on behalf of my client, Rachel McCarthy, but also the co-appellee, Brandon McCarthy, as we filed the same brief. But for the record, Mr. McCarthy's counsel, Alan Morrison, is also present today at the counsel table. So I just want to start by talking about what's apparent from the indictment. The government's underlying theory of this case is that the McCarthys have distributed a readily consumable form of opium latex to opium users who they knew were going to ingest it to get high. That's the alleged conduct. And I'm looking, I just want to point into the indictment where they talk about selling to, quote, opiate users, refer to most buyers as, quote, individuals purchasing the product for personal use and consumption, and describe in paragraph eight that consumers ingest unprocessed poppy seeds to get high, and that, quote, the most common method of ingesting unprocessed poppy seeds coated in opium latex is brewing poppy seed tea. So why do I say this? It's because, in other words, the underlying conduct that's being alleged here is distribution by the McCarthys and possession by the end users. And this is a problem for the government because Congress has explicitly legislated that poppy seeds with opium latex coating are not a controlled substance. What that means is, like every other not controlled substance, even if it has properties that could be dangerous, you can't be charged under the Controlled Substance Act for distributing, and you can't be charged for use or simple possession. So with that statutory exemption not challenged on appeal and clear from the text of the Controlled Substances Act, the government is trying to get at that exact same conduct through a statute, the precursor statute, that's a manufacturing statute. It's intended to stop the process of the creation of a drug in the first place. And it's a poor fit to try to jam what is essentially distribution and possession conduct that perhaps the government thinks should be illegal but isn't into a manufacturing statute. It just isn't designed for this case, and it's not a good textual fit. And just to kind of illustrate the result of the government's argument here, you have it being legal under the Controlled Substances Act for someone like the McCarthy's who knows about the properties of poppy seeds to sell to someone they know is an opium user if that person is intending to eat a couple of cups of poppy seeds raw to feel that opiate effect. Same if they sell to an opiate user who is maybe going to suck on the seeds for a while to try to get some of that latex off and then spit them out. If I put them in my morning smoothie, I've ingested the seed, I'm maybe getting an intoxicating effect from that, but this isn't controlled under the Controlled Substances Act. However, according to the government, if a user prefers to drink the latex via poppy seed tea and has strained out the seed from that water, those users have suddenly manufactured a controlled substance under 841A1 and are subject to the penalties that come along with that. These are the same people that in the indictment the government has referred to as opium users and individuals purchasing the product for personal use. So just getting to outline sort of the textual hooks that I'm talking about here. The first I think I've sort of alluded to and Judge Timkovich you did as well, which is this statutory exemption for distribution and possession of this not controlled substance covers the exact conduct that we're talking about here. That's why it's inconsistent. Our argument is not more broadly that if you exempt something in one part of a statute, it necessarily exempts it in the other part of the statute. What I'm saying is here, what is specifically exempted is the conduct at issue in this case and that is why the precursor statute is a backdoor to criminalization of something that Congress has already spoken on. That's textual hook number one. Even if we don't look at the statutory exemption, we then need to look at the text of the precursor statute itself and there there are two at least two limiting components of the text of that statute that make it clear it's not intended to cover a particular method of consumption by the end user. So the first is the itemized list of precursor nouns, whether it's one or two lists, they're together in this statute and the first four, the more specific nouns here, are a very specialized flask that allows for multiple chemical reactions at one time, what's essentially a pill presser, a tabulating machine, so putting the drug into pill form, an encapsulating machine, which I understand to be putting a drug into capsule form and then the gelatin capsules themselves. None of those to me invoke an end user using a product. It's not common that you would think of a user of a drug as first putting their drug into pill form and then ingesting it. All of them invoke some sort of deliberate process that is more than just getting after an end user and that's because we're talking about manufacturing. You're looking at 843A7, right? 6 and 7, the same list of nouns. So 7 prohibits distributing any equivalent medical chemical product or material which may be used to manufacture a controlled substance, intending or having reasonable cause to believe that it will be used to manufacture a controlled substance. Correct, Your Honor. So why does that not cover selling these seeds to someone whom you know will be using it to make the tea that contains a controlled substance? I think an assumption in that question is that washing a coating of latex off of a seed is necessarily manufacturing within the context of the Controlled Substances Act and it certainly is not because if it is, then pretty much any minor action that an end user takes to consume a drug, lighting a joint, the government has conceded you wouldn't refer a spoon that you might heat something up in in order to ingest it, that wouldn't be something under manufacturing. If just washing off, even if it's a vigorous shaking process, a coating that pre-exists, that the government was ready to charge as a controlled substance in its own right, is manufacturing a controlled substance then I think there's a real problem with this statute because it means it's not clear to anyone if you have manufactured something and you're subject to a felony or if you've maybe possessed something like a joint and lit it and now you're subject to a misdemeanor sinful possession offense. So could you then address 802.15 which is the definition of manufacturing?  And it does say manufacturer means the production etc. either directly or indirectly or by extraction from substances of natural origin. Absolutely. Can you distinguish that? The government assumes that removing a coating of latex from a poppy seed, which their own indictment says doesn't have any alkaloids in the poppy seed, is extraction under the manufacturing statute. I'm not aware of a case that specifically talks about extraction, but if you look at what extraction means in other contexts of drug manufacturing, for instance, if you think about removing cocaine from a coca leaf, the first process is to extract the coca paste. It's a somewhat of an involved process. The district or the DC Circuit has described it as the leaves undergoing an extensive processing before where processors shred the leaves, mash them with a strong alkali like lime, a solvent like kerosene and sulfuric acid. Then you get this light brown paste that then has to go through further manufacturing to be powder cocaine. I'm sorry if the microphone went out. My point being that this assumption that washing something is extraction is, I think, erroneous, both in terms of how we typically see extraction in the drug manufacturing context, but also because this statute and the verbs within it must be interpreted in a way that does not collapse the distinction between a manufacturing and a use. What about getting gold out of goldworm? You're sluicing it with water. No one would say that's extracting the gold from the rock that you dug up? I don't have a lot of mining factual background, Your Honor, but I do think even if there's a way to describe, you know, if I say I bought some fruit last night and I washed off the dirt and the pesticides, I've extracted them. I could say that, but we're talking about interpreting an action in the context of the Controlled Substances Act, which specifically delineates between manufacturing and use. And so the definition of manufacturing in the context of this statute has to be interpreted in a way that can't be extended to something that an end user is doing with an end product. I do want to note, though, that I think that there are two distinct, although interrelated, limiting textual components of the precursor statute. So one is the definition of manufacturing, which can't be extended to as broad as possible form, or we're left with a real problem in the Controlled Substances Act. But the second is this list of nouns once again. So it invokes, when you're talking about a precursor, when we're going to penalize somebody for contributing to a manufacturing process, even if theoretically you could say that one, you know, because one step of an assembly line is lighting something on fire, lighting something on fire is manufacturing, we're not going to go after the person who provides a lighter to the person with the joint because we need more of a deliberate production process in order for the statute to apply. Before you get to that, I was just thinking about, you know, obviously, but how would you distinguish sort of the Sudafed precursor case versus the poppy seed precursor case? Because Sudafed, when it is being used to manufacture some other drug, can be a precursor. It's okay that it's a substance. My point here is that poppy seeds with opium latex on them are a readily consumable form of opium latex that Congress has carved out from the Controlled Substances Act and said is legal as an end product. And so is Sudafed. And so Sudafed, I think, I'm not quite sure if Sudafed is a listed chemical, but if it is, then it can be prosecuted in that way. Let's assume it's not. Yeah, so Sudafed to Sudafed is not going to go in the precursor statute. Sudafed, as used in the process to manufacture methamphetamine, might be a precursor, and so it's somewhat context dependent. But there aren't any cases that I'm aware of, and certainly not that the government has cited, where the precursor statute has been applied essentially to the use of an end product. Nearly every case at the circuit level that I have seen talks about methamphetamine. I understand the statute isn't limited to methamphetamine, but where it's been used is in these real deliberate production processes. There's not a case where end user, heroin user, used a spoon to ingest, to ultimately ingest the heroin product, and that's been considered manufacturing, or that that's been considered distribution of a precursor. But intent is what's the key here. Yes, let me talk about- You're selling this product, encouraging people to manufacture the opium by extracting it through tea. I know you don't like the word extracting. I didn't mean to foreclose that argument. But they're getting the opium through the tea. That's their clear intent, and the purpose is to give the buyer a means of creating opium for them to get high. So I want to talk about the intent piece, because the government continues to kind of make the dichotomy between knowing that someone's going to use it to get high, and knowing that maybe somebody is going to make a poppy seed muffin. That's actually not the relevant distinction here. The relevant distinction is, do you know that this method of using a drug to get high is okay, and this method of using the drug is not? So it's carved out one particular method of consumption of poppy seeds. The McCarthy's could legally, under the statutory exemption for a controlled substance, for it not being a controlled substance, distribute the poppy seed to someone they know as a drug user, who's going to eat the poppy seeds raw. They can know all of that, and not know that just because the user decides to follow the most common method of ingesting, that now suddenly they're on the hook for precursor penalties, and also that that end user is on the hook for a manufacturing penalty. So that's really what the distinction is here is, is there enough in the statute for somebody to know that a particular method of use, a particular method of consumption, is not okay when everything else is? And I think going to vagueness quickly in my last minute, if the court is unsure whether the precursor statute could cover this conduct, as applied to this case, there is an affirmatively misleading part of the statute, where you have this statutory exemption saying, the distribution of poppy seeds to a drug user, for that drug user to get high by eating them, is okay. Now we've interpreted a manufacturing statute to say, except when that person drinks the opium via tea. That is a affirmatively misleading statement in a different part of the Controlled Substances Act, that both poses a fair notice problem for persons in the McCarthy's situation, but also is a separation of powers problem, because as I understand it, the government continues to think this only applies to poppy seeds, with a particular amount of opium latex on them. Are they going to charge somebody who tells you how to make poppy seed tea, with a processed poppy seed and it's poppy seed tea light? That's not clear from any of the argument that the government has briefed or made today. There's both a separation of powers and a notice problem, because of the interaction between the statutory exemption, for distribution and use even in the drug context, and this one method of use to drink the opium from poppy seed tea. Good answer. Do we have one list here or two lists? I read it as one list, but I don't think that particular question matters. So I'll just point the court quickly to the Fisher case, the Supreme Court case in 2024. You have subsection C1 and subsection C2. That's two distinct subsections. C2 is a broader otherwise subsection. C1 has specific conduct that constitutes obstruction in that context. So this is the obstruction of an official proceeding statute. Subsection C1 has very specific ways to violate the obstruction statute, which relate to the destruction of like documentary evidence. Subsection C2 is saying and other forms of obstruction too, and this was applied to the January 6th conduct, and the Supreme Court said we're going to read those two subsections together, even if they're two delineations in the statute, because otherwise you have rendered this very high for highly particularized verbs and means of violating that statute utterly surplusage. You can't go from this is obviously about destruction of documentary evidence to like and anything else too, including assault. And so, yeah, I don't think that the one to two thing is sort of a misleading point here. Thank you, Your Honors. So something that Ms. Yaffe just said was that pseudofed, when it's being used to manufacture meth, would be a precursor, and it's conduct specific or context specific. And I hope I'm not misquoting, but that is exactly the same argument that we are making about poppy seeds. Pseudofed is not in and of itself a controlled substance. Pseudoephedrine is a listed chemical, but it's not a controlled substance. And then you have cases involving things like lithium, which is not a controlled substance or a listed chemical, but can be used as a precursor. And then the other thing that I heard was that manufacturing under the Controlled Substances Act doesn't connote an end user making things for his or her own personal use. That totally flies in the face of all the manufacturing cocaine base cases that we've got, where all you need to be a manufacturer of cocaine base is a pot, water, cocaine powder, and baking soda. And you can make that for your own personal use. It also flies in the face of the Wood case from 1995, where this court said, even though you claim that all you were doing was cutting some leaves off of marijuana plants, that's manufacturing under the Controlled Substances Act. Because, like Ms. Yaffe said, it's conduct specific. It's context specific. The other thing that I just want to point out is that there's nothing in the indictment or in the record that says you can make a controlled substance by eating poppy seeds raw. The indictment makes very clear, although it says one of the ways to get the opium latex off poppy seeds is by making poppy seed tea. What's being alleged here is that they extracted the opium latex from the surface of the poppy seeds by making poppy seed tea. There's no allegation and there's no reality if you talk to some of these end users of the poppy seed tea like we have. There's no reality that you can get any sort of a high from eating poppy seeds raw. And by the way, the word extract, which I think Judge Hartz asked about, that just means to take out of. So, it comes from the Latin traere, which means to pull or to draw. So, there's nothing fancy about extracting something from a substance of natural origin. So, if there's no further questions, we'd ask the court to reverse. Thank you, counsel. Case is submitted. Counselor excused.